274 So.2d 790 (1973)
Succession of Mary Eloise SUPPLE.
No. 5523.
Court of Appeal of Louisiana, Fourth Circuit.
March 13, 1973.
*791 Stone, Pigman, Walther, Wittmann & Hutchinson, Phillip A. Wittmann, Hirschel T. Abbott, Jr., New Orleans, for appellant and plaintiff-in-rule, Joseph S. Bolton.
Monroe & Lemann, Malcolm L. Monroe, Walter J. Suthon, III, J. Thomas Lewis, New Orleans, for appellee and defendant-in-rule, Whitney National Bank of New Orleans.
Before LEMMON, STOULIG and BOUTALL, JJ.
STOULIG, Judge.
Plaintiff,[1] as principal and income beneficiary of a testamentary trust, has appealed a judgment dismissing his rule to show cause why the Whitney National Bank of New Orleans should not be removed as trustee. He has alleged the defendant, motivated by a conflict of interest, is improvidently administering his estate.
The trust was created in the will of Mary Eloise Supple in these terms:
"I give and bequeath in trust all of my stocks in J. Supple's Sons Planting Co. Ltd. and J. Supple's Sons Mercantile Co. Ltd. both of Bayou Goula, Louisiana to Whitney National Bank of New Orleans, Louisiana as trustee in trust for my grandnephew, Joseph Maurice Supple, Junior to be held in trust for said Joseph Maurice Supple, Junior until he arrives at his thirty first birthday.
"I hereby name, constitute and appoint Whitney National Bank of New Orleans or its successor or successors or its transferee or its transferees to be the trustee of the trust herein created. I hereby instruct my trustee to pay the net earnings of said stocks to the said Joseph Maurice Supple, Junior at least semi-annually. When the said Joseph Maurice Supple, Junior is attending high school or college if the net earnings from the said stocks are not sufficent [sic] to pay for his education and his maintenance and upkeep then I vest my trustee with the power of selling so much of said stock or stocks as will give the trustee sufficient [sic] funds to accomplish this purpose. Such sale may be made by my trustee at private sale extra-judicially upon such terms and conditions as my trustee may see fit and proper. * * *"
In 1954 the Whitney, as trustee, was sent into possession of the corpus, consisting of 1,930 shares of common stock in J. Supple's Sons Planting Co., Ltd. (hereinafter referred to as the Planting Company), and 310 shares of common stock in J. Supple's Sons Mercantile Co., Ltd. The Planting Company stock held in trust for plaintiff represents 20 percent of the outstanding shares and it was the Whitney's policy in voting these shares at stockholders' meetings in 1971 and 1972 that provoked this litigation.
The Planting Company has operated a sugar growing and milling business for many years. Its principal asset is 4,200 acres of land on the banks of the Mississippi River. Over the past few years diminishing profits have led the stockholders to agree unanimously that the corporation's assets should be liquidated. However, there is a sharp division of opinion as to the price that can be obtained. An adjacent landowner, W. T. Burton, offered to buy the Planting Company's lands for $2,500,000 cash; whereas the directors of the Planting Company obtained an appraisal from a realtor fixing the value of its holdings at $5,040,000.
The testimony reflects the Planting Company shareholders, excluding plaintiff's interest, are equally divided on the issue of liquidation. Present management, controlling 40 percent of the voting stock, deems it advisable to withhold action on the Burton offer until further efforts are made to sell at a higher price. The other 40 percent would vote to accept the offer. Thus, the stock held in trust represents *792 the "swing" vote. The Whitney voted in 1971 and 1972 to retain the present management, thus, in effect, blocking the immediate liquidation of the Planting Company assets.
Plaintiff, if permitted to vote the stock held in trust for him, would align himself with those shareholders favoring immediate sale. For the past two years, as income beneficiary, he has been paid a return of $1 per share. Based on the Burton offer of $2,500,000, plaintiff values his Planting Company stock at $500,000. His complaint is that the income yielded by this amount of capital is grossly inadequate and that if the stock were sold and the funds reinvested, the yield should be a minimum of 6 percent of the capital, or $30,000 per annum.
Plaintiff contends the Whitney is violating its obligation as trustee by maintaining the corpus of his trust in low income yielding stock in order to further its own interest. He asserts the bank is primarily interested in forestalling liquidation in order to retain the Planting Company's substantial commercial account from which the bank derives profit.
Bolton's action is based on LSA-R.S. 9:1789, which provides:
"A trustee may be removed in accordance with the provisions of the trust instrument or by the proper court for sufficient cause shown."
Plaintiff urges a conflict of interest constitutes "sufficient cause," and from the following summarized sequence of events he would have us conclude the bank has subverted its duty as trustee to insure its own future profit.
On June 24, 1971, plaintiff contacted a Mr. Beaumont, a trust officer of the Whitney, to discuss how his 20-percent interest in the Planting Company would be voted at the annual stockholders' meeting to be held two days later. He advised Beaumont he wished to vote to liquidate the corporation's assets because the stock was yielding a low return. Beaumont agreed the bank would vote the shares according to plaintiff's instructions. At the meeting the bank reversed its position. Mr. Beaumont did not attend; however, another trust officer, Mr. Welsch, was sent to vote the Bolton interest. In so doing, he followed the instructions of Keehn Berry, chairman of the board of the Whitney, by voting to retain present management. This effectively blocked affirmative action on the Burton offer.
At the same meeting, a majority voted to form a committee to pursue the sale of the Planting Company lands. According to plaintiff, the board members appointed themselves to the committee and nothing was done.
In January, 1972, plaintiff contacted one of the trust officers at the Whitney to advise nothing was being done by the Planting Company committee appointed to seek out a prospective purchaser of the assets. His inquiry about pressing for liquidation or divesting himself of his stock held in trust was referred to the Whitney's attorneys. As a result Guy B. Scoggins, representing the bank, advised him by letter dated February 9, 1972, that his stock could be sold if certain conditions were complied with. The letter stated in part:
"After discussing the matter, we concluded thatwhereas the will of your great-aunt states that the stock should be held in trust until you reach the age of 31 years, it did not specifically prohibit the sale of the stock. For this reason, we feel that the stock could be sold, provided the approval of the Court is obtained.
"We further concluded that, in order to properly present the matter to the Court, it would be necessary for us to have a specific offer to purchase either the stock, or the property belonging to the Companies. In this way the Court would have definite facts from which it could draw a conclusion.
"It would be my suggestion that if someone is interested in purchasing either *793 the stock or the assets of the Companies, that this party submit a written offer, spelling out all the terms and conditions of the proposed purchase. This agreement to purchase should then be forwarded to me, in order that I can prepare a petition to properly present the matter to the Court for its determination.
"If the Court approves, then the Whitney Bank would be in a position to vote the stock in favor of the sale. If it is anticipated that this offer to purchase will be presented at the Annual Meeting of the Shareholders, then you should forward us the information at least 45 days before the anticipated meeting, in order that we can have sufficient time to complete the transaction.
"After discussing the matter, we feel that we must have some definite offer to present to the Court, as it would be impossible to obtain a blank order to sell the stock, without having specific information regarding the sale.
"If you wish to discuss the matter more fully, I shall be pleased to do so."
It does not appear that plaintiff followed any of the procedures suggested by the bank's attorney for liquidating his interest in the Planting Company. Nor did he avail himself of the opportunity to discuss the matter with Scoggins.
On May 5, 1972, Bolton persuaded the trust officer Beaumont to execute a proxy giving two of plaintiff's designees authority to vote his stock at the 1972 annual meeting of stockholders scheduled for June 29. The plaintiff testified the proxy was given unconditionally. According to Beaumont he advised plaintiff at the time of his intention to attend the annual meeting and to revoke the proxy if in his opinion it became necessary to do so. Thus, according to Beaumont, the proxy was given with the understanding the bank's representative retained veto power.
Two days before the annual meeting, plaintiff contacted Mr. Beaumont to assure himself the bank would not reverse its position. This call apparently precipitated the intervention of Berry, who, until this time, was unaware the proxy had been given. Berry then contacted Ed Supple, leader of the present management faction of the Planting Company, to be briefed on the situation. When he learned the reasons for the impending stock fight he wrote directly to Supple revoking the proxy.
On June 28, plaintiff made further attempts to have the bank execute a proxy authorizing him to vote the 20 percent held in trust. His attorney tendered to the bank a document relieving the bank of any liability for executing the proxy, but Berry, nonetheless, remained adamant and refused to give the proxy. At this conference Berry expressed a desire to have the Whitney removed as trustee if this could be accomplished legally. Plaintiff interpreted this to mean that the bank would join in a petition to have it removed as trustee and the parties would jointly seek court approval for such an action. According to Berry, he was simply wishing himself out of an unpleasant situation although he felt a trustee could not voluntarily abdicate the responsibility.
The following day, a bank representative voted to postpone the annual meeting until August 18, 1972, to give the plaintiff an opportunity to remove the trustee in the interim.
On July 13, 1972, plaintiff's attorney presented to the bank a "Petition to Terminate the Trust, And In The Alternative to Appoint a Successor Trustee." It was expected the bank would join in and concur; however, plaintiff's attorney was advised no such action was possible. Hence this suit.
The thrust of plaintiff's argument for removal is that the bank blocked the sale of the Planting Company assets to retain a prize commercial account. The record reflects the Planting Company has been banking with the Whitney for many years. It was not established exactly when the *794 business relationship began but testimony of one of the bank representatives indicates the Planting Company and the Supple family were depositors before 1935.
Exhibits produced establish the Planting Company maintains a checking account in the Whitney that has carried balances of between $100,000 and $200,000 over the years. In 1971, management used a portion of the checking account funds to buy short term certificates of deposit. As it happened, one certificate of deposit was either purchased or renewed the same day Berry revoked plaintiff's proxy.
Plaintiff would have us infer the purchase of the certificate of deposit was a form of payoff to the bank for voting with management of the Planting Company. The evidence simply does not support this conclusion. In reviewing the checking account balances, it does not appear the average cash on deposit varied materially in 1971 and 1972 as compared to past years. It simply shows that the Planting Company began in 1971 to use idle funds for short term investments. This policy did not increase the bank's profits; rather, it cost the Whitney money: the transaction represented a transfer of funds from a noninterest-bearing checking account to interest-bearing certificates of deposit.
Based on the foregoing resume of facts we fully agree with the trial court's finding that the plaintiff failed to bear the burden of proof necessary to preponderate in favor of the conclusion that the bank has a conflict of interest that would prevent its administering the trust for the best interests of the beneficiary.
Plaintiff's attack on the bank's administration is stated primarily from the standpoint of the income beneficiary. He points out that a return of $1,930 per annum on stock valued at $500,000 is ridiculously low. However, Berry explained the bank's position that if land held by the Planting Company can be sold at twice the price of the Burton offer (which in Berry's opinion is low based on the fact that the bank recently sold acreage in the same area for a considerably higher price), the corpus of the trust would be $1,000,000 rather than $500,000 and the plaintiff's interest as principal, as well as income beneficiary, would profit from the capital gains tax benefits as opposed to annual investment income. Obviously should the property be sold at a price more commensurate with its appraised value in a comparatively short period of time, the increase in net income would be more than sufficient to overcome any loss of investment revenues occasioned during the delay.
With the evidence before us, we cannot view the Whitney's vote as inept or ill-advised. The bank supports present management who voted to explore the possibilities of selling their assets at a higher price than that offered by Burton. We make this observation because plaintiff has argued the Whitney has taken an irresponsible position in administering its finances. Under LSA-R.S. 9:1789, we think a trustee should be removed if the trust estate is obviously being mismanaged, whether there is or is not a conflict of interest. However, the record discloses no evidence of mismanagement but merely a conflict of opinion between the trustee and the beneficiary.
The plaintiff's animosity toward this trustee is understandable in view of the fact that the bank has reversed its position on several occasions. This has happened because the chairman of the board has overruled the decision of junior trust officers. As a consequence, plaintiff has been caused inconvenience and embarrassment. While we find the bank's conduct and attitude toward the trust beneficiary less than commendable from a public relations standpoint, we cannot conclude the bank has breached the fiduciary duty entrusted to it by Mary Eloise Supple in her last will and testament.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] Plaintiff's surname was changed from Supple to Bolton after his mother remarried.